CHURCH BY MAIL, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Church by Mail, Inc. v. Commissioner
Docket No. 28229-82X.
United States Tax Court
T.C. Memo 1984-349; 1984 Tax Ct. Memo LEXIS 329; 48 T.C.M. (CCH) 471; T.C.M. (RIA) 84349; July 10, 1984. Clifford N. Ribner,J. C. Joyce, and Craig Blackstock, for the petitioner. Dianne I. Crosby and Henry G. Salamy, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: This is an action for declaratory judgment pursuant to section 7428. [1] Petitioner filed an application for recognition of exemption from Federal income tax on January 21, 1980, seeking exemption under section 501(c)(3) and *331 claiming to be a church within the meaning of sections 509(a)(1) and 170(b)(1)(A)(i). [2] After a lengthy administrative review, respondent, on August 31, 1982, issued an adverse ruling which stated in part that-- You are not operated exclusively for exempt purposes within the meaning of section 501(c)(3). You are operated in furtherance of a substantial non-exempt purpose. Part of your net earnings inures to the benefit of private individuals. Furthermore, you serve private rather than public interests. Even if you were an organization described in section 501(c)(3), you would be a private foundation because you are not a church within the meaning of section 170(b)(1)(A)(i), the only basis upon which you claim non-private foundation status. Petitioner then timely filed its petition herein. *332 This case was submitted fully stipulated pursuant to Rule 122. The administrative record stipulated by the parties is incorporated herein by this reference. See Rule 217. Petitioner was incorporated in Oklahoma on November 28, 1978. Its officers are Rev. James E. Ewing, president, Rev. M. R. McElrath, senior vice-president, Rev. D. R. Luce, vice-president, Doris Ratliff, secretary, and Rev. O. Duane Snyder, treasurer. [3] Rev. Ewing and Rev. McElrath run petitioner. Petitioner's principal activity consists of mailing its literature, which focuses on the ministry of Rev. Ewing, to individuals throughout the United States. Since its incorporation, petitioner has sent its mailings to over 3,000,000 homes. Petitioner's "congregation" consists of approximately 160,000 households, who receive petitioner's mailings on a regular basis (approximately once per month). Petitioner *333 has no house of worship. [4] Petitioner has also held, on a few occasions, revival meetings and crusades around the United States. [5]
Petitioner maintains an office where its employees carry on petitioner's activities in Beverly Hills, Calif. The recipients of petitioner's mail correspond with it, however, through a post office box in Atlanta, Ga. Brinks, Inc., a courier service, picks up the mail from the Atlanta box and ships it to Tulsa, Okla. (via Delta Airlines), where the mail is delivered by Brinks to the Bank of Oklahoma in Tulsa. Bank personnel separate the donations from any prayer requests, deposit all donations in petitioner's account with the Bank of Oklahoma, and forward all prayer requests to petitioner's California office. The literature petitioner mails is procured through Twentieth *334 Century Advertising Agency, Inc. (Advertising). Rev. Ewing and Rev. McElrath are the sole shareholders of Advertising. [6] Advertising does not printing itself. Instead, it subcontracts the work out and bills petitioner the subcontractor's price plus a 15-percent commission. Any bill unpaid after 90 days incurs interest charges of 1-1/2 percent per month. Advertising also makes advances to petitioner for postage, etc.; interest thereon begins to accrue immediately at 1 percent per month. Although Advertising apparently has clients not related to Rev. Ewing and Rev. McElrath, [7] it does not advertise its services. Approximately two-thirds of the time of Advertising's employees is devoted to petitioner's needs. No legitimate business reason exists for petitioner's utilization of Advertising to contract out its printing, as those persons with "expertise" in these matters (Rev. Ewing and Rev. McElrath) are employed by both Advertising and petitioner. See pp. 18-19, infra. Between April 1980 and February 1981, Advertising advanced $2,867,180 to petitioner. During this same period, petitioner repaid principal of $1,757,178 and paid Advertising $180,515 in commissions and *335 $26,549 in interest. Twentieth Century Data Processing, Inc. (Data), all of whose stock is owned by Rev. Weing and Rev. McElrath, [8] provides petitioner, through Advertising, with computer services that petitioner needs to distribute its literature. [9] Data makes no profit on its dealings with Advertising; instead, Advertising adds 15 percent to Data'a cost and bills petitioner accordingly. *336 Rev. Ewing's Evangelistic Ministries, Inc. (Ministries) is an organization operated by Rev. Ewing and Rev. McElrath in much the same manner as petitioner; each organization focuses on Rev. Ewing and his teachings of donating money to receive "God's blessings." Although petitioner and Ministries apparently have separate mailing lists, the literature utilized by each organization is similar and they have co-sponsored certain revival meetings. Petitioner, Ministries, and Advertising share office space at 450 Doheney Road, Beverly Hills, Calif. Other than Rev. Luce, Rev. Snyder, and Richard Sutherland of Data, the record does not reveal any employees of petitioner, Ministries, Advertising, or Data who are not related to Rev. Ewing or Rev. McElrath. [10] Rev. Ewing's workday [11] is devoted approximately 40 percent to petitioner, 40 percent to Ministries, and 20 percent to Advertising. Rev. McElrath's workday is devoted approximately 50 percent to petitioner, 40 percent to Ministries, and 10 percent to Advertising. Since 1977, Rev. Ewing and Rev. McElrath have received, as compensation for services, the following amounts from petitioner, Ministries, and Advertising: [12]
Rev. Ewing
Year
Petitioner
Ministries
Advertising
Total
1977
$21,350.00
$21,350.00
1978
none
70,700.00
none
70,700.00
1979
none
67,500.00
$10,600 (from May)
78,100.00
1980
[13] $48,600
29,015.30
88,294.22
165,909.52
1981
48,600
8,100.00
111,600 (through
168,300.00
August)
Rev. McElrath
1977
$14,070.00
$14,070.00
1978
none
59,060.00
none
59,060.00
1979
none
50,782.65
$10,600 (from May)
61,382.65
1980
n13 $46,500
18,150.30
86,300
150,950.30
1981
46,500
6,889.54
111,600 (through
164,989.54
August)
*337 *338 In 1980, Brenda Ewing, Rev. Ewing's daughter, received $10,500 from Data, $8,550 from petitioner, and $5,519.29 from Ministries. Paul Ewing, Rev. Ewing's son, received $30,000 from Advertising. Ray McElrath, Jr., Rev. McElrath's son, received $30,000 from Advertising and $10,500 from Data. In 1980, petitioner received $3,000,155 in "contributions" from its "members." During that same year, petitioner incurred "direct expenses" -- direct expenses of its mailings -- of $2,958,060 [14] and "other expenses" of $680,867.[15] Petitioner's net loss for 1980 was thus $638,772, which, when combined with petitioner's earlier losses of $169,613, totaled a net loss since incorporation of $808,385. Petitioner's unaudited balance sheet dated December 31, 1980, lists assets of $66,711 and current liabilities of $875,096, of which $848,219 represents accounts payable to Advertising.[16]
*339 Advertising billed commission income during 1980 of $204,240.30 to petitioner and $51,175.56 to Ministries and apparently received $60,144.30 in commission income from organizations unrelated to Rev. Ewing and/or Rev. McElrath. Advertising also apparently received $1,444,000 from "unrelated" organizations for undisclosed services. Advertising's balance sheet dated March 31, 1981, lists retained earnings of $774,977. [17]
Petitioner's "message" is based on the proposition that God is the source of all blessings and that, to receive God's blessings, "Christians should contribute of their means cheerfully, regularly, systematically, proportionately and liberally." Both petitioner and Ministries solicit donations, inter alia, through a monthly donation plan called "Your Gold Book Partnership with God." Petitioner's mailings are replete with exhortations to become a "Gold Book" member and with testimonials of the spiritual, physical, and financial blessings people have received after becoming *340 members. One page of one mailing contains, inter alia, the following testimonials [18] under the heading, "Jesus says 'Give, and it shall be given unto you' (Luke 6:38)": Dear Rev. Ewing, I have just got to let you all know what God has done for me since requesting prayer. * * * Yesterday I had only $1.00 to send for the help of God's work, but I put God first and sent that dollar. Today God blessed me with a check for $1,392.89. Oh, what a wonderful God we have. * * * I believe in God. * * * I am sending my Gold Book payment and $25.00 to help with God's work. * * * Dear Rev. Ewing, God has been good to me * * *.I have been a Gold Book Member for over five years and God has been showering blessings upon me. About two months ago I sent in my prayer request that property I owned back east would be sold, that I would be rid of it, and hardly had I sent this request * * * to you all before God answered! I am sending these two checks as a love offering to help carry on God's work. I am thanking God * * *. Truly God's Word is true. I am a witness that He will supply all our needs. He does supply mine. Dear Rev. Ewing, The Lord has blessed me since I became a Gold Book Member. *341 He has blessed me with a new car. I will always be a Gold Book Member. Continue to pray for me * * *. I am sending my Gold Book payment. May God bless you. Interspersed with these testimonials are pictures of a check, a house, a new car, and a Gold Book.Below these testimonials is the statement, "Your GOLD BOOK has been prayed over and it is charged with GOD'S POWER and PROMISES * * *. The next step is up to you * * * our address is on the Front Cover. * * * Write us now!!!" Petitioner's mailing for persons to request a "sealed word from the Lord" states: Yes Rev. Ewing, *342 I have a worry and I want God's success and prosperity blessings on my life. Psalms 37:4 Please check: [] I want "soul power". [] I want a new home. [] I want a new car. [] I want a lump sum of money. How much? $    . [] I want healing for myself and someone else. * * * Rev. Ewing, I want to help you in all the things that God has called you to do. Here is my offering of [] $20.00 [] $10.00 [] $5.00 [] $    . Another mailing from petitioner states in part: Will you * * * sacrifice $5 to $10? Wait a minute, I know this is a sacrifice for you. The Holy Spirit said to ask you to give God something you planned for something else. Sacrifice it to God for those lost souls. Prove God (Mal. 3:10) even if you have to borrow $5 to $10, borrow it in the name of the Lord. God sees that need you have. He said, if we would give, it would be given back to us many times over. This is an opportunity. You're investing in God's kingdom. Please, before midnight tomorrow night, get this blessed envelope back in the mail box. Don't wait!! We must hear from you immediately. Say in your heart, "God, I'm giving $5 to $10 (even if I have to *343 borrow it) to God's work (based on Malachi 3:10), for that extra blessing." * * * I [Rev. Ewing], too, am going to borrow money to give to the soul-winning cause. A million years from now, you'll be glad you answered this letter before midnight tomorrow night. [Emphasis added.] Petitioner's monthly "worship service" is merely another mailing preaching the blessings one will receive if one follows Rev. Ewing (and makes the requested donations). Several mailings contain items, such as a "prayer rug," a "page from my [Rev. Ewing's] Bible," a "faith handkerchief," a "crimson red virtue cross," etc., to be kept overnight (or for a few days) and then returned to petitioner with a (usually the amount requested) donation. A thank-you letter mailed to people who return the prayer rug includes "anointing oil" and, inter alia, with emphasis as indicated, the following directions: The Bible says to annoint the sick with oil. A lot of people are sick financially. They need to be healed financially * * *. It seems like the devil's bunch has all the money, but I believe God can bless his children and supply your every need. I do feel this -- that you need a financial healing *344 in this home -- am I right??? You see this anointing oil that I've enclosed to you? You're holding the miracle blessing in your hand, if we do it God's way, he can bless our lives and do more for us than anybody we know. I ask you in Jesus name to go to your billfold and take out the largest bill you have. It may be a $50 dollar bill, a $100 dollar bill, a $20 dollar bill, a $10 dollar bill, you and God know which it is. Take this anointing oil and anoint all four corners of that bill and mail it here to God's work. At the same time, I want you to anoint all four corners of every bill that you have. Give God your biggest and best and ask him for his biggest and best.
A letter, with emphasis as indicated, accompanying a "mantle" to be prayed on and then returned, with an offering, to petitioner contains the following statement about Rev. Ewing's own experience: Rev. Duane Snyder and I were sitting in Denny's Restaurant in Santa Monica, California and I noticed this man sitting at a table across from ours, crying. I went over and sat down with him and told him, "I am a man of God and I couldn't help but notice his tears. I asked if I could help him in any way? *345 " He told me that he had been in prison and that he had four children and a wife and that he couldn't find a job that made enough money to feed his family. He said he couldn't make enough driving a cab and because of his prison record he couldn't get a good job. I felt angels around that table as the Holy Spirit moved upon me to get in my billfold and give him everything I had, from my two weeks paycheck. (I draw a paycheck just like everyone else). I had $287.00 left and God told me to give him every penny of that. I did not I felt the angels of joy dancing around that table in that restaurant. And did you know that just a few days later, a man called me up and gave me this seventeen passenger airplane to carry my staff and me to revival meetings across America. He filled that plane up with gas and as we all flew it to our revival headquarters building, angels of blessings danced all around it, inside and outside that miracle airplane that God had provided for our ministry. Here is a picture of it. * * * I believe God gave me that airplane for my ministry because I gave that man that $287.00 (every dime I had on me)! *346 To qualify for exemption under section 501(c)(3), petitioner must show that it is "organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any * * * individual." [19]Section 501(c)(3). Respondent has not contended that petitioner was not "organized" for religious purposes, but rather that it was not "operated" for such purposes and that the fruits of its activities inured to the benefit of private individuals. Accordingly, our analysis is confined to an examination as to whether petitioner satisfied the operational and related private inurement tests of section 501(c)(3). Moreover, in making our analysis, we have assumed that petitioner is operated, at least in part, for religious purposes, although we are constrained to note that it is at least questionable, on the basis of the materials distributed by petitioner to its members, whether petitioner sought primarily to enable its "members" to obtain secular (particularly financial) rather than spiritual benefits. *347 The governing principles in applying the operational and private inurement tests of section 501(c)(3) have been set forth in numerous cases and very recently in Canada v. Commissioner, 82 T.C.     (June 18, 1984). In the interest of completeness, we again set forth these principles as a backdrop to our analysis. The burden of proof rests with petitioner. Rule 142(a). In determining whether petitioner has satisfied its burden, we have confined ourselves, both in terms of our findings of fact and our analysis, to the stipulated administrative record and any inferences that may fairly be drawn therefrom. See Dumaine Farms v. Commissioner,73 T.C. 650, 664-665 (1980). An organization is operated "exclusively" for exempt purposes if its activities primarily serve one or more exempt purposes and not, except to an insubstantial degree, a non-exempt purpose. Section 1.501(c)(3)-1(c)(1), Income Tax Regs. The existence of a "single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." *348 Better Business Bureau v. United States,326 U.S. 279, 283 (1945). See also, Nat. Assn. of American Churches v. Commissioner,82 T.C. 18, 28-29 (1984). The purpose toward which an activity is directed, rather than the nature of the activity itself, determines whether the operational test is satisfied. Bethel Mennonite Church v. Commissioner,80 T.C. 352, 360 (1983), on appeal (7th Cir. July 11, 1983). "[A]n organization is not operated exclusively for exempt purposes unless it is operated for the benefit of the public rather than for the benefit of a private interest." Church of the Transfiguring Spirit v. Commissioner,76 T.C. 1, 5 (1981). See also, Bob Jones University v. United States, 461 U.S.     (May 24, 1983). Additionally, the statute requires that no part of the organization's "net earnings" inure to the benefit of any private individual. Section 501(c)(3). In determining whether these conditions are satisfied, the "operated exclusively for exempt purposes" and the "private inurement" tests often substantially overlap. See Canada v. Commissioner,supra. *349 The fact that petitioner may have been operated for religious purposes is not sufficient to satisfy the "private inurement" test. Church of the Transfiguring Spirit v. Commissioner,supra at 5-7; Levy Family Tribe Foundation v. Commissioner,69 T.C. 615, 619 (1978). Similarly, "net earnings" include more than net profits and may inure to the benefit of private persons other than in the distribution of dividends. Unitary Mission Church v. Commissioner,74 T.C. 507, 512-513 (1980), affd. without opinion 647 F.2d 163 (2d Cir. 1981). One final preliminary observation. Whether the operational requirement of section 501(c)(3) has been satisfied is a question of fact, to which the foregoing legal principles are then applied. Presbyterian & Reformed Pub. Co. v. Commissioner,79 T.C. 1070, 1082 (1982), on appeal (3d Cir., July 6, 1983); Pulpit Resource v. Commissioner,70 T.C. 594, 604 (1978). In this context, the location of the burden of proof may be determinative. Compare *350 World Family Corp. v. Commissioner,81 T.C. 958 (1983). Moreover, we have recognized that the decided cases provide only broad bench-marks, with the result that the "relevant facts in each individual case must be strained through those [established] principles to arrive at a decision on the particular case." See Pulpit Resource v. Commissioner,supra at 612. In short, each case is sui generis. For this reason, we have concluded that a dissection of the cases cited by the parties would for the most part serve no useful purpose. Respondent contends that petitioner was operated to a substantial degree for nonexempt purposes in that it benefited Rev. Ewing and Rev. McElrath through its "business arrangements" with Advertising. Petitioner contends that it was operated exclusively for religious purposes and that the reasonableness of petitioner's payments to Advertising rather than the financial rewards to Rev. Ewing and Rev. McElrath and their families is the critical element. We find it unnecessary to delve into the question of the reasonableness of the arrangements between the entities involved herein, particularly the arrangements between *351 petitioner and Advertising. We reject petitioner's invitation to compartmentalize our analysis. We believe that the entire network of arrangements and relationships must be scrutinized to determine whether petitioner satisfies the operational requirement of section 501(c)(3). On this basis, we are satisfied that the element of reasonableness becomes subordinated, if not irrelevant, to the overriding impact of the pervasive control of those arrangements and the entities involved by Rev. Ewing and Rev. McElrath and the benefits (both actual and potential) accruing to them. On this basis, we conclude that petitioner has not carried its burden of persuading us that respondent erred in rejecting its application for exempt status. Petitioner argues at great length that the arrangement with Advertising promoted petitioner's religious interests rather than the private interests of Rev. Ewing and Rev. McElrath. First, petitioner contends that Advertising was able to obtain lower printing prices for petitioner (even including the 15-percent commission) than petitioner would have been able to obtain on its own. We recognize that the general conclusion as to more favorable treatment *352 of Advertising is set forth in the administrative record and that facts as represented in the administrative record must usually be assumed to be true. Rule 217(b)(1); Dumaine Farms v. Commissioner,supra. Nevertheless, we believe that we are not required to assume the truth of such a conclusory statement of fact where other factual allegations in the administrative record undermine its validity. That record discloses that petitioner accounted for two-thirds of Advertising's printing work [20] and that the same people (Rev. Ewing and Rev. McElrath) would be dealing with the actual printers in their capacity as representatives of either petitioner or Advertising.Thus, it would appear that the intervention of Advertising, insofar as petitioner is concerned, was illusory in that petitioner would have been able to obtain directly the same lower printing costs as Advertising allegedly obtained. [21] Additionally, we note that petitioner's proof as to the availability of more favorable terms through Advertising is based on estimates of printing costs by printers other than the printers selected to do the jobs. There is no evidence in the record herein that the printers *353 who did the work in fact gave Advertising a more favorable rate than they would have given petitioner. [22]
Second, petitioner points to the substantial advances made by Advertising to petitioner for printing expenses and postage when, petitioner contends, the money could have been invested more safely elsewhere at a higher after-tax rate of return. Rev. Ewing's and Rev. McElrath's "altruism" in causing Advertising to make these *354 advances (at 18 percent annual interest on advances unpaid after 90 days for printing expenses and 12 percent annual interest on advances for postage) when most banks apparently would not extend petitioner credit [23] is belied by their control of both sides of the transaction. If Rev. Ewing and Rev. McElrath wished to have Advertising earn more or less interest (and thereby divert more or less of petitioner's receipts (donations) into their own pockets), they could merely cause petitioner to borrow more or less money or pay it back faster or slower. The record before us simply does not convincingly establish, as petitioner contends, that petitioner borrowed as little as possible from Advertising and paid it back as quickly as possible. [24]
*355 Third, petitioner contends that the 15-percent printing commission that Advertising charged was reasonable, since Advertising took care of all the non-artistic, non-religious aspects of the printing and mailing. Regardless of whether the 15-percent rate was reasonable or excessive, Rev. Ewing and Rev. McElrath (through Advertising) benefited substantially from the operation of petitioner. See est of Hawaii v. Commissioner,71 T.C. 1067, 1080-1081 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). As petitioner's expenses payable through Advertising were by far the largest of its expenditures (over two-thirds of petitioner's "direct expenses" in 1980), the arrangement between Advertising and petitioner, in effect, gave Rev. Ewing and Rev. McElrath a significant percentage, off the top, of petitioner's receipts. Cf. People of God Community v. Commissioner,75 T.C. 127, 133 (1980) ("section 501(c)(3) denies exempt status to an organization whose founders or controlling members have a personal stake in that organization's receipts"). In light of petitioner's ability to handle its printing contracts directly [25] and the lack of *356 any legitimate business reason for petitioner to utilize a for-profit corporation owned by Rev. Ewing and Rev. McElrath to handle this work, we find that petitioner was operated in its business dealings with Advertising for the substantial nonexempt purpose of filling the pockets of Rev. Ewing and Rev. McElrath (and their families) with monies intended by the donors for "God's work." *357 In pointing to the element of dual control by Rev. Ewing and Rev. McElrath, we recognize that it may be argued that this element should only be taken into account in determining petitioner's right to exempt status at a future date. See Pulpit Resource v. Commissioner,supra at 612. But in view of the dollar volume of transactions between petitioner and Advertising (both in absolute and proportional terms) and the significant potential for abuse, we are entitled to take the element of dual control into account in determining petitioner's present entitlement to exempt status. [26] In this connection, we think that our conclusion as to the potential for abuse through manipulation of the entities involved is reinforced by the fact that Data supplied its service to Advertising at cost rather than at a price that would reflect a profit which normal business practice would have dictated. Finally, it is obvious that the substantial benefits which inured to the benefit of Rev. Ewing and Rev. McElrath and their families during the taxable years encompassed by the record herein, see pp. 25-26, infra, reflect a present abuse arising from the element of dual control. *358 Petitioner makes much of the fact that the cash flow from petitioner to Advertising was never sufficient to eliminate indebtedness of the former to the latter and that this situation was expected to continue -- indeed, with an ever-increasing gap. from this, petitioner reasons that, in actuality, Advertising could never expect to benefit beyond the payments it received for services rendered, which petitioner contends, and we have assumed, were reasonable. This is a curious argument, because it proceeds on the assumption that petitioner will ultimately fail financially -- an assumption which we are not convinced that the record herein requires us to make. Moreover, such argument ignores the fact that, in the event of petitioner's financial failure, Advertising would acquire the presumably unrestricted benefit of petitioner's mailing lists -- property which we cannot say, on the basis of the record herein, would be without value. See n. 25, *359 supra.Nor are we impressed with petitioner's attempt to buttress its position by reference to Advertising's business with other nonrelated clients. Any such business, in our opinion, does not indicate that Advertising was not used by petitioner as a vehicle for the latter's operations for a non-exempt purpose. Moreover, the record herein is devoid of any evidence as to who those clients were and any supporting data with respect to the business transacted with them. [27] Under these circumstances, we do not believe we are required to take at face value petitioner's general statement as to the extent of such unrelated business, even if it had some relevance to the issue before us. est of Hawaii v. Commissioner,supra at 1081 n. 14. The case most analogous to the situation herein in est of Hawaii v. Commissioner,supra. The petitioner in that case was a nonprofit organization which engaged in the promotion of "est," an intrapersonal *360 awareness and communication concept. Pursuant to a licensing agreement, the petitioner was to pay 50 percent of its gross receipts to International, a for-profit corporation. We rejected the petitioner's claim that, since it was not formed by the same individuals who formed International (i.e., since it had "no connection" with any for-profit corporation) and since its transactions with International were "reasonable" and at "fair market value," it had no commercial purpose of its own. Instead, we agreed with respondent that the petitioner was part of a franchise system which was operated for private benefit and that the petitioner's affiliation with this system tainted it with a substantial commercial purpose. Petitioner herein contends that est of Hawaii is distinguishable, because the petitioner therein was the "tool" of a for-profit corporation, while here, according to petitioner, Advertising was used as a tool for petitioner's activities. We refuse to decide this case upon the basis that it makes a difference through which end of the telescope one looks. Our thorough review of the record herein convinces us that Advertising, Data, Ministries, [28] and petitioner were *361 all used as tools to enrich Rev. Ewing and Rev. McElrath. [29] In 1980, Rev. Ewing received over $165,000 from his various related organizations, Rev. McElrath received over $150,000, Brenda Ewing received almost $25,000, Paul Ewing received $30,000, and Ray McElrath, Jr., received over $40,000. [30] Rev. Ewing and Rev. McElrath also received cars and parsonage allowances, and all the employees received health insurance. [31] Finally, Advertising received the right (if petitioner is ever able to collect enough money from its "members") to a substantial percentage of petitioner's gross receipts in commission and interest income. Certainly, it cannot be said herein that petitioner "used" Advertising. Instead, it can only be said that Rev. Ewing and Rev. McElrath used petitioner, Ministries, Advertising, and Data for their own benefit. *362 The long and the short of the matter is that, taking facts revealed by the record herein in their entirety -- the extent of the integration between petitioner's activities and those of its related entities, the control of those entities by Rev. Ewing and Rev. McElrath, [32] the substantial current as well as potential abuse through manipulation of the arrangements between those entities and the obviously large amounts of current and direct financial benefits (to say nothing of the potential for future benefits) derived from the operations of those entities by Rev. Ewing and Rev. McElrath and their families -- petitioner has failed to carry its burden of proof that it is entitled to exempt status under section 501(c)(3). Even though petitioner's avowed purpose may ultimately be exempt in nature, petitioner has not convinced us that a substantial, if not principal, purpose of its operations was not to generate income for the private benefit of Rev. Ewing and Rev. McElrath and their families. See Christian Manner International v. Commissioner,71 T.C. 661, 669 (1979). *363 Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect and all references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. A November 12, 1980, letter to respondent from petitioner's counsel asserts that petitioner is also seeking exemption as a section 170(b)(1)(A)(vi) organization. In light of our conclusion on the section 501(c)(3)↩ issue, we need not reach this question.
3. Neither Rev. Ewing nor Rev. McElrath ever attended divinity school. Both were ordained by the Independent Assemblies of God, San Diego, Calif, Rev. Luce attended Southwest Bible College, Waxahatchie, Tex., for two years. Rev. Snyder graduated from Southwestern Bible College, Oklahoma City, Okla.↩
4. Petitioner has stated that it intends to construct (as funds allow) a church building and conduct services therein, but there is no indication in the administrative record that this has taken place. ↩
5. Petitioner also intends to sermonize on radio and TV programs. Here again there is no indication in the administrative record that any such activity has yet taken place.↩
6. Advertising was incorporated on February 23, 1978. Rev. Ewing and Rev. McElrath each invested $250 in the corporation. ↩
7. The administrative record simply contains general allegations as to the existence of other clients. Petitioner refused to supply respondent with any written specifics in this regard. See also p. 24, infra.↩
8. Data was incorporated on May 7, 1979. Rev. Ewing and Rev. McElrath each invested $250 in this corporation. ↩
9. Data maintains an office at space occupied by Signal Data Services, Inc. (Singnal Data).The business relationship (if any) between Signal Data and Data is not clear from the record. Data pays a Richard Sutherland, an employee of Data, $54,996 to prepare necessary computer programs and be "responsible for all computer functions required by [petitioner]."↩
10. Rev. Luce receives a $36,000 salary from petitioner; Rev. Snyder receives a $45,000 salary from petitioner, even though he suffered a severe heart attack in 1979 and has had to curtail his activities substantially since that time. ↩
11. Petitioner alleges that Rev. Ewing and Rev. McElrath each works an average of 18 hours per day for petitioner, Ministries, and Advertising. ↩
12. Rev. Ewing also receives a parsonage allowance of $3,320; Rev. McElrath's parsonage allowance is $1,365. Rev. Ewing and Rev. McElrath also receive certain health benefits provided by petitioner to its employees. Advertising provides automobiles for Rev. Ewing and Rev. McElrath; Advertising's balance sheet dated March 31, 1981, lists the cost of these two vehicles as $48,789. ↩
13. Petitioner contends on brief that neither Rev. Ewing nor Rev. McElrath received a salary from it in 1980. However, since petitioner's own financial statement lists "salaries" expense of $193,817 for 1980 and since the record does not indicate who, other than Rev. Ewing, Rev. McElrath, Rev. Luce, Rev. Snyder, and Brenda Ewing, received salaries from it, we conclude that the salaries paid to those five persons in 1981 ($184,650) were also paid to them in 1980.↩
14. Petitioner's unaudited financial statements list the following "direct expenses" for 1980: ↩
Printing/mailing - letter answering
$14,835
Printing/mailing
1,577,242
Printing
37,494
Postage - magazines
47,903
Postage - mail
427,346
Postage - answer mail
90,974
Computer processing
487,108
Computer - 20th Century Data
13,000
Freight expenses
60,197
Art work & Design
17,605
Photography work
1,633
Cost of mail inset materials
16,278
Envelope costs
45,411
Security
5,259
Insurance
751
Orphanage costs
400
Miscellaneous crusade costs
92,124
Specialty items - Christmas expense
22,500
15. Petitioner's unaudited financial statements list the following "other expenses" for 1980: ↩
Accounting
$14,760
Advertising
960
Automobile lease
80
Automobile expense
10,683
Bank service charges
2,534
Donations
18,676
Dues and publications
195
Employee benefits
3,328
Employee rentals
3,742
Group insurance
783
Interest
167,658
Legal
41,854
Maintenance and repairs
21,783
Medical expenses
2,575
Office expense
17,114
Parsonage
6,930
Promotion
1,903
Rent
53,375
Salaries
193,817
Outside labor
10,846
Taxes - payroll
13,052
Taxes - property
2,391
Telephone
18,227
Uniform rental
2,580
Utilities
8,822
Insurance
4,600
Travel
53,543
Kitchen supplies
3,261
Relocation expense
795
16. Petitioner's other liabilities were: ↩
Notes payable - Manufacturer's bank
$16,370
Accounts payable - Data
390
Payroll taxes payable
3,082
Loan payable - Ministries
7,035
17. Advertising's current assets, as of March 31, 1981, were: ↩
Cash
$29,500
Accounts receivable - Ministries
352,540
Accounts receivable - Petitioner
1,257,186
18. A disclaimer in small print in the corner of this mailing states-- All printed testimonies have been reproduced as reported with editing being limited to construction and grammar. Church By Mail, Inc., assumes no legal responsibility for the veracity or permanency of reported healing, miracles, or other happenings. All supernatural events and blessings are contingent upon natural events and blessings are contingent upon spiritual condition, relative to the individual, and any other deviation from the intended Divine plan could result in mental, physical and or spiritual setback -- John 5:14.↩
19. Respondent does not contend that petitioner attempted to influence legislation or participate in, or intervene in, any political campaign.↩
20. Petitioner and Ministries together accounted for over four-fifths of Advertising's printing work. ↩
21. Moreover, we note that, assuming Advertising did business with other clients, see p. 24, infra, and p. 4, supra,↩ it is more than likely that the large volume of business carried out by Advertising in respect of petitioner's activities would have enabled Advertising to obtain more favorable terms than otherwise would have been available for those clients. 22. Moreover, the absence of any subsidy for petitioner's printing expense is indicated in an affidavit by Rev. Ewing, which states, "[Advertising] does not provide lower printing costs to one client at the expense, cost, or other detriment to any other client of [Advertising]."↩
23. Petitioner apparently had trouble securing bank loans because of the bankruptcy of another organization that was previously operated by Rev. Ewing and Rev. McElrath. ↩
24. Petitioner stresses that, even though Advertising advanced it $2,867,180 between April 1980 and February 1981, petitioner was able to repay $1,757,178 of it during that period and paid only $26,549 in interest. However, petitioner's financial statement for 1980 lists accrued interest of $167,658. Since approximately 97 percent of petitioner's debts on December 31, 1980, were owed to Advertising, see p. 9, supra,↩ it seems likely that most of the interest accrued during thay year was owed to Advertising.
25. Petitioner alleges that it is caught in a "Catch-22" situation, because only through the operation of Advertising on a for-profit basis with clients in addition to those connected with Rev. Ewing and/or Rev. McElrath was Advertising able to accumulate sufficient sums of money to keep petitioner in operation and, yet, if petitioner had had Advertising's clients (and therefore Advertising's money), respondent would have argued that petitioner was operated for a commercial purpose. Petitioner's contention misses the point. Cf. Ecclesiastical Order of Ism of Am, Inc. v. I.R.S.,725 F.2d 398 (6th Cir. 1984). Respondent's concern is, not that Advertising should have handled only non-Rev. Ewing/McElrath organizations (with petitioner handling its own printing), but that, by controlling both sides of the loan transaction, Rev. Ewing and Rev. McElrath could manipulate the interest payments to their personal benefit. Moreover, since the advances by Advertising were secured by a lien on petitioner's mailing list, Advertising would acquire what is probably petitioner's most valuable asset should petitioner go bankrupt. The potential benefit to Rev. Ewing and Rev. McElrath is obvious. See also p. 23, infra.↩
26. We note that we made such an evaluation in Pulpit Resource v. Commissioner,70 T.C. 594, 612↩ (1978), and concluded that the potential future drainoff of profits was "unlikely." We are unable so to conclude herein.
27. There is an indication that petitioner may have orally supplied respondent with some information in this regard, but obviously any such information is not contained in the record herein.↩
28. Ministries received a letter from respondent, dated July 31, 1979, granting it exempt status under section 501(c)(3)↩. As far as the record herein shows, Ministries' exempt status has not been revoked. Since that letter antedated petitioner's application for exemption and Ministries is not a party to this proceeding, we express no opinion as to the continued validity of Ministries' exempt status. 29. The interrelationship between these organizations and their use to enrich Rev. Ewing and Rev. McElrath is illustrated by the manner in which Rev. Ewing's and Rev. McElrath's ever-increasing compensation was paid. In 1979, Rev. Ewing received $67,500 in compensation from Ministries and $10,600 from Advertising. In 1981, as Advertising's "business" grew, Rev. Ewing received only $8,100 from Ministries (to whom he devoted 40 percent of his time, apparently doing exactly the same work as in 1979) and $111,600 (for the first eight months of 1981) from Advertising (even though he devoted only 20 percent of his time to that organization). Rev. McElrath's compensation figures relfect a similar trend. See p. 7, supra.↩
30. We disagree with petitioner that we must, in light of the interlocking relationships of the various entities involved in activities of Rev. Ewing and Rev. McElrath, only take into account the payments to them by petitioner. However, even if we were to accept petitioner's position, we have already pointed out that, even if it were reasonable, inurement would still exist in the system of commissions and interest payments set up between petitioner and Advertising. ↩
31. In addition, no breakdown was given for certain of petitioner's 1980 expenses -- crusade costs, $92,124; travel, $53,543 -- which might well have constituted, at least to some extent, inurement to Rev. Ewing and Rev. McElrath.↩
32. In this connection, we note that only "members," which consisted of the original trustees and those elected by them, controlled petitioner. The consequence is that Rev. Ewing and Rev. McElrath had, through self-perpetuation, the continuing capacity to retain control of petitioner.↩